23 So.2d 14

OSBORN v. STATE.

7 Div. 762.

Court of Appeals of Alabama.

June 26, 1945.

Rehearing Denied Aug. 7, 1945.

J. B. Sanford, of Talladega, and Handy Ellis, of Columbiana, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and John O. Harris, Asst. Atty. Gen., for the State.

BRICKEN, Presiding Judge.

Appellant admittedly killed Albert De-Loach, by shooting him with a pistol, and upon the trial of this case in the court below the jury returned a verdict finding him guilty of manslaughter in the first degree fixing his punishment at imprisonment for nine years and eleven months. Judgment of conviction was pronounced and entered, in accordance with the verdict of the jury, from which this appeal was taken.

Defendant relied upon self-defense, and insisted that he was wholly free from fault in provoking or bringing on the difficulty. The evidence shows without dispute that the homicide happened in appellant's place of business at an early hour in the morning. The defendant was on duty and conducting his place of business, which was a cafe in the town of Childersburg. The deceased, DeLoach, was a policeman of said town, and in company with another policeman entered the cafe belonging to defendant. It was without dispute that no disorder was or had been going on in the cafe, and the two police officers had no official duty to perform therein when they entered. The testimony also shows, when the police officers entered the cafe they went to where one Mary Thompson was sitting, on the left hand side of the cafe, about the middle of the building. She was a customer and

was at the time drinking a cup of coffee. About that time appellant came from the rear out of the kitchen to a place on the right hand side of the cafe, just opposite where the officers were talking to this woman, Mary. The officers, or at least DeLoach, stood there and talked to Mary a few minutes. Then DeLoach left Mary, crossed over the room to where defendant was standing behind his counter near a coffee urn, with only the counter between them. The uncontradicted evidence shows that DeLoach was shaking his finger in defendant's face and saying something to him, and it was while the parties were in this position that the shooting began.

While talking to Mary, DeLoach told her that if she did not get out of town he was going to arrest her, he had no warrant of arrest and did not claim to have any. The evidence tends to show that defendant had not done a thing to DeLoach and had said nothing to him until DeLoach began shaking his finger in his face. Defendant's pistol was on the shelf just below the top of the counter behind which he was standing. When DeLoach fell, his pistol was on the floor near his outstretched hand. The woman, Mary, testified that the two officers had her down at the City Hall the night before, but for what reason it was not disclosed, but they told her they were going to get even with defendant.

When DeLoach was talking to defendant (Osborn) he did not tell him he had any warrant for his arrest or that he had violated any law, but did tell him to shut his mouth or he would put him under bond. Some of the evidence tended to show that when DeLoach crossed over from the left hand side of the cafe to the counter which separated him from defendant, Hammett followed him over there and was there in the vicinity of DeLoach when the shooting began, but started then running towards the front door.

Some of the testimony tended to show that both officers had their pistols in their hands in the cafe while the shooting was going on.

A portion of the statement of facts in appellant's brief reads as follows:

"The testimony for the defendant showed that while DeLoach was shaking his finger in defendant's face, he, DeLoach, drew his pistol, that defendant did not make any hostile move towards DeLoach until DeLoach had pulled his pistol, but when DeLoach pulled his pistol, defendant

grabbed his pistol from his shelf from under the counter and the shooting began, and that the shooting was all over pretty quickly, and that both officers had pistols in their hands, and as stated, when they were done, the pistols were either in their hands or beside them. It was shown without conflict by several witnesses that about a week or ten days before the fatal difficulty, DeLoach, in the presence of Hammett, accosted defendant on the sidewalk when the latter was on his way back from the post office to his cafe, and told him that he had heard that defendant had been telling that they (the officers) had been sleeping in the booths in the cafe, and defendant was trying to get him fired off of his job, and when defendant denied this, DeLoach told him that if he heard of it any more he was going to kill defendant and ordered defendant to get on down the sidewalk and get in his place of business and stay there.

"Defendant testified that when DeLoach accosted him in the cafe, DeLoach told him that he was still messing with their business and was trying to get them fired, which defendant denied, and then DeLoach told him that he knew he had been doing that and that he had told him a few days before that if it happened again he was going to kill defendant and then cursed him with a vile oath and told him he was going to kill him, and that while DeLoach was making that statement, he was shaking his finger in defendant's face, and that DeLoach got his gun out and when DeLoach pulled his gun out, defendant grabbed his pistol up from under the counter on a shelf and began shooting, and that DeLoach snapped his pistol at him, but he did not know whether DeLoach ever shot or not, but he did not fire the first time it snapped; that he saw DeLoach fall. Defendant also testified that a few nights before the fatal difficulty he had walked out of his cafe early in the morning to get a breath of air and that officer Hammett was on the sidewalk some little distance from the cafe and that he asked Mr. Hammett how he was getting along and that Hammett told him it was none of his business and ordered defendant to get back in his place of business and stay there.

"When the officers went in the cafe on the morning of the shooting, there was no difficulty going on therein, no drinking, no disorderly conduct and nothing to call them there, and there was no pretense that they had any duties to perform in the cafe."

Pending the trial several exceptions were reserved to the rulings of the court, some of which appear to be well taken. From the record it appears that upon arraignment the defendant plead "not guilty," and also, "not guilty by reason of insanity." During the trial defendant abandoned the plea of not guilty by reason of insanity, and made no effort of any nature to prove said plea, offered no evidence to that end, and said plea, as shown by the record, was withdrawn before the case was put to the jury.

The defendant testified in his own behalf, and upon his cross-examination, the State, over repeated objections and exceptions, was permitted by the court to interrogate him as to various whiskey cases against him in Tuscaloosa County alleged to have happened some five or six years ago, and as to the result of the trials in the whiskey cases. This portion of the cross-examination of the defendant as transcribed consumed about four pages of this record. Insistent and strenuous motions were made to exclude this testimony. Said motions were overruled.

■ The statute, Title 7, Section 434, provides, among other things, a witness may be interrogated as to his having been convicted of a crime involving moral turpitude as affecting his credibility. Violation of the prohibition law does not involve turpitude. In our case of Moore v. State, 26 Ala.App. 607, 164 So. 761, 763, this court said: "The inquiry of witnesses touching their former conviction for the offense of violating the prohibition law in order to impair the weight of their testimony and reflect upon their credibility was improper, prejudicial, and injurious. This line of inquiry should not have been attempted or indulged. A conviction for said offense does not come within the purview of section 7723 of the Code 1923 [Code 1940, Tit. 7, § 435], wherein it is provided, a witness may be examined touching his conviction of crime, for the crimes contemplated by said section are those which involve moral turpitude. Section 7722, Code 1923 [Code 1940, Tit. 7, § 434]. It has repeatedly been held that a violation of the prohibition laws of this state, both as to misdemeanors and felonies, does not in contemplation of law involve moral turpitude, hence not a proper inquiry for the purpose of affecting the credibility of a witness. Abrams v. State, 17 Ala.App. 379, 84 So. 862; Lyles v. State, 18 Ala.App. 62, 88 So. 375; Lakey v. State,

206 Ala. 180, 89 So. 605; Ex parte Marshall, 207 Ala. 566, 93 So. 471, 25 A.L.R. 338."

█ It is a well settled rule that in a prosecution for a particular offense evidence tending to show defendant guilty of another and distinct offense, disconnected with the crime charged, is inadmissible; the manifest purpose of this rule being to prevent prejudice to the defendant in the minds of the jury by the introduction of evidence of offenses for which he is not indicted, to which he is not finally to answer, and building up a conviction on inference of guilt from the fact that he had committed another offense. The justice, fairness, and reason for the rule is apparent, and, as said in the case of Gassenheimer v. State, 52 Ala. 313: "A strict adherence to it is necessary to prevent criminal prosecutions from becoming instruments of oppression and injustice."

The Constitution of this state (Const. 1901, Sec. 6) provides that in all criminal prosecutions the accused has a right to be heard by himself or counsel, or either, to demand the nature and cause of the accusation, and to have a copy thereof, etc.; and in the Gassenheimer Case, supra, it was said: "No man shall be twice put in jeopardy for the same offence, and of the nature and cause of the accusation made against him, he shall be fully informed before he is called to trial, is the paramount law of the land. Than that accusation, he cannot be supposed to stand prepared to answer."

█ The rule, above announced, which requires that all evidence which is introduced shall be relevant to the guilt or the innocence of the accused, is always applied with considerable strictness in criminal proceedings. The wisdom and justice of this, at least from the defendant's standpoint, are self-evident. The defendant can with fairness be expected to come into court prepared to meet the accusations contained in the indictment only. The evidence introduced over the defendant's objection relating to other offenses than that charged in the indictment no doubt alarmed the suspicions of the jury, or at least it may have had that effect, and inclined them the more readily to believe in the guilt of the defendant of the offense charged, and rendered the jury less inclined to listen or give proper weight and consideration to whatever was offered or said in his defense. For it is well known, in fact a matter of common knowledge, that the large majority of persons of average intelligence are untrained in logical methods of thinking, and are therefore prone to draw illogical and incorrect inferences and conclusions without foundation. It is also a matter of common knowledge that from such persons jurors are selected. And, like others, they will very naturally believe that a person is guilty of the offense with which he is charged if it is proved to their satisfaction that he has committed any offense under the law.

The trial court was of course aware of the correctness of the above stated propositions of law. This was evident as the court in its numerous rulings upon the questions under discussion undertook to justify the position taken by the court in this connection by stating that this testimony as to former conviction of defendant upon misdemeanor charges was admissible on the issue of insanity. As contended by counsel for appellant: "The defendant had made no effort whatever to prove his plea of insanity, and that issue simply was not before the court. In fact the plea of insanity was withdrawn later, but at the time this testimony was elicited on cross-examination of the defendant, he had absolutely made no effort to prove insanity, and notwithstanding the fact that the court stated that the testimony was limited to the plea of insanity, yet insanity was not an issue, because the defendant had made no effort to prove any such condition of his mind."

█ It affirmatively appears that said testimony remained with the jury and was therefore before them in their deliberations as to the guilt or innocence of the defendant. The State was under no duty to assume the laboring oar, or to take the initiative in this matter, and certainly after the plea had been withdrawn the insistent motions of appellant to exclude, which had not been withdrawn, should have prevailed. That all this was highly prejudicial to the substantial rights of the accused cannot be questioned.

There are several other insistences of error presented, but we shall advert to only one and this has reference to the action of the trial court in unduly restricting the cross-examination of State witness Mary Thompson, and also to the action of the State wherein it appears the effort was made in effect to impeach its own witness, Mary Thompson, hereinabove referred to. In this connection earnest counsel for ap-

pellant contends in briefs that State witness, Mary Thompson, was a very unfriendly witness to defendant. Immediately after the shooting she was locked up in the county jail at Talladega and kept there until after the Hammett case was tried, a period of several weeks, and was then turned out, no charges ever having been prosecuted against her at all. While in jail she was in the custody of State and county officials and defendant should have been allowed to prove this fact as affecting her credibility.

In this connection the following question was propounded to her on cross-examination:

"Q. Well, now isn't it a fact, immediately after this shooting, you were locked up in the county jail and remained in the county jail until Osborn was tried, and you was turned out the day the trial was over, and no charges prosecuted against you at all?"

The State's objection to this question was sustained and to this ruling defendant reserved an exception.

The State witness, Mary Thompson, in the present case, testified on cross-examination that the two officers, DeLoach and Hammett, knew that she was working at the cab station there at Childersburg, and had carried her to the City Hall the night before and had made threats against defendant and said they were going to get even with him and one Monroe Thomas.

On redirect examination the State questioned her closely as to her testimony in the trial of the Hammett case as well as to her testimony on direct examination of the State in this case, and she admitted that before she was put on the stand in the present case, she told Mr. Stringer, who was a special prosecutor in the case, that she had never heard Mr. DeLoach or Mr. Hammett say anything against the defendant. She was then interrogated as to whether she had talked to a man by the name of Mims Tierce after her direct testimony and stated that she did not remember having talked to him. Thereupon the special prosecutor propounded to her the following question:

"Q. Who else have you talked to since you were on the stand yesterday?"

Defendant objected to this question and to an adverse ruling, reserved an exception. A number of questions interrogated the witness as. to the names of the various people to whom she had talked since her direct testimony, without naming the witnesses and without showing that they had any interest in the case whatsoever. The defendant objected to all these questions and moved to exclude the answers thereto, and seasonably reserved exceptions to each adverse ruling. The appellant insists that "the whole of these questions and answers constituted a scheme to discredit the State's own witness in an unauthorized way. She had admitted that she had told one of the prosecuting solicitors before her direct examination that she had not heard the officers make any threat against defendant, but explained this by saying that she became confused, excited and scared, because when she was testifying the lawyers were objecting and overruling, but insisted that the officers did make the threats to which she testified. Then on re-direct examination she again admitted that she had told Mr. Stringer that she had not heard any threats. This, we insist, was as far as the State had a right to go, unless, of course, they had proof that someone interested in the defendant or acting at his instance had induced her to change her testimony and swear falsely. We insist that they did not have the right to undertake to destroy the small bit of testimony she had given in favor of defendant by interrogating her generally about everybody she had talked to."

We are not prepared to hold error in the court's rulings relative to what occurred after the shooting was over, for in our opinion the questions propounded and answers given as to what the defendant did, and what he said and his demeanor, while probably not allowable, were not hurtful to defendant and did not unduly or injuriously affect his substantial rights.

The judgment of conviction from which this appeal was taken, for the reasons stated, is reversed and the cause remanded.

Reversed and remanded.

CARR, J., not sitting.